IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| RONNIE W.,[1] ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| v. ) | Civil Action No. 7:20-cv-490 |
| ) | |
| KILOLO KIJAKAZI,[2] ) | |
| **Acting Commissioner of Social Security,** ) | |
| ) | |
| **Defendant.** ) | |

### REPORT AND RECOMMENDATION

Plaintiff Ronnie W. ("Ronnie") filed this action challenging the final decision of the Commissioner of Social Security ("Commissioner") finding him not disabled and therefore ineligible for a period of disability and disability insurance benefits ("DIB") under the Social Security Act ("Act"). 42 U.S.C. §§ 401–433. Ronnie alleges that the Administrative Law Judge ("ALJ") erred by failing to properly (1) determine his RFC using a function-by-function analysis and (2) assess his allegations regarding his symptoms.

I conclude that substantial evidence supports the Commissioner's decision in all respects. Accordingly, I **RECOMMEND GRANTING** the Commissioner's Motion for Summary Judgment (Dkt. 16) and **DENYING** Ronnie's Motion for Summary Judgment (Dkt. 14).

### STANDARD OF REVIEW

This court limits its review to a determination of whether substantial evidence supports

---

[1] Due to privacy concerns, I use only the first name and last initial of the claimant in social security opinions.

[2] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi is hereby substituted for Andrew Saul as the defendant in this case.

the Commissioner's conclusion that Ronnie failed to demonstrate that he was disabled under the Act.[3] Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (internal citations and alterations omitted); see also Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019) (emphasizing that the standard for substantial evidence "is not high"). "In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." Mastro, 270 F.3d at 176 (quoting Craig v. Chater, 76 F.3d at 589). Nevertheless, the court "must not abdicate [its] traditional functions," and it "cannot escape [its] duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). The final decision of the Commissioner will be affirmed where substantial evidence supports the decision. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

## CLAIM HISTORY

Ronnie filed for DIB in January 2017, claiming his disability began on December 5, 2016, due to low back pain radiating down his right leg with numbness, osteoarthritis in lumbar spine, cyst on spine, headaches, and degenerative disc disease in his lumbar spine. R. 233, 236, 272. Ronnie's date last insured was December 31, 2020. Thus, he must show that his disability

---

[3] The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Disability under the Act requires showing more than the fact that the claimant suffers from an impairment which affects his ability to perform daily activities or certain forms of work. Rather, a claimant must show that his impairments prevent him from engaging in all forms of substantial gainful employment given his age, education, and work experience. See 42 U.S.C. §§ 423(d)(2), 1382c(a)(3)(B).

began on or before this date and existed for twelve continuous months to receive DIB. R. 12, 269; 42 U.S.C. §§ 423(a)(1)(A), (c)(1)(B), (d)(1)(A); 20 C.F.R. §§ 404.101(a), 404.131(a). The state agency denied Ronnie's applications at the initial and reconsideration levels of administrative review. R. 75–84, 85–94. On December 19, 2018, ALJ Joseph Scruton held a hearing to consider Ronnie's claim for DIB. R. 45–74. The ALJ held a supplemental hearing on August 16, 2019. R. 32–43. Counsel represented Ronnie at both hearings, which included testimony from vocational experts Barry Hensley and Asheley Wells. On September 18, 2019, the ALJ entered his decision analyzing Ronnie's claims under the familiar five-step process[4] and denying his claim for benefits. R. 15–25.

The ALJ found that Ronnie was insured at the time of the alleged disability onset and that he has not engaged in substantial gainful activity since his alleged onset date. R. 17. The ALJ found that Ronnie suffered from the severe impairments of lumbar spine degenerative disc disease with radiculopathy, lumbar spine myofasciitis, and left shoulder impingement with residuals of prior rotator cuff disorder. Id. The ALJ determined that these impairments, either individually or in combination did not meet or medically equal a listed impairment. R. 18. The ALJ specifically considered listing 1.02 (major joint dysfunction) and 1.04 (disorders of the spine). R. 18.

---

[4] The five-step process to evaluate a disability claim requires the Commissioner to ask, in sequence, whether the claimant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of a listed impairment; (4) can return to his past relevant work; and if not, (5) whether he can perform other work. Johnson v. Barnhart, 434 F.3d 650, 654 n.1 (4th Cir. 2005) (per curiam) (citing 20 C.F.R.§ 404.1520); Heckler v. Campbell, 461 U.S. 458, 460–62 (1983). The inquiry ceases if the Commissioner finds the claimant disabled at any step of the process. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The claimant bears the burden of proof at steps one through four to establish a prima facie case for disability. At the fifth step, the burden shifts to the Commissioner to establish that the claimant maintains the residual functional capacity ("RFC"), considering the claimant's age, education, work experience, and impairments, to perform available alternative work in the local and national economies. 42 U.S.C. § 423(d)(2)(A); Taylor v. Weinberger, 512 F.2d 664, 666 (4th Cir. 1975).

The ALJ concluded that Ronnie retained the residual functional capacity ("RFC") to perform sedentary work, except that Ronnie can sit, stand, or walk up to one hour each at a time for a total of up to eight hours sitting in a workday and up to two hours of standing and/or walking in a workday. R. 19. Ronnie can have no exposure to excessive humidity, extreme cold or heat, vibrations, excessively loud background noise, and hazards such as heights and machinery. Id. Ronnie cannot drive. Id. He can occasionally reach overhead with his left upper extremity, but he cannot crawl or climb. Id. Ronnie can occasionally kneel, crouch, stoop, and balance, and he must be allowed the opportunity to stand at his workstation up to five minutes per hour. Ronnie may incur unscheduled absences of up to one day per month. Id. The ALJ determined that Ronnie is unable to perform any of his past relevant work, but he could perform jobs that exist in significant numbers in the national economy, such as order clerk, bonder, and inspector. R. 24. Thus, the ALJ determined that Ronnie was not disabled. Id. Ronnie appealed the ALJ's decision, and the Appeals Council denied his request for review on June 19, 2020. R. 1–4.

## ANALYSIS

Ronnie alleges that the ALJ failed to properly determine his RFC using a function-by-function analysis and assess his allegations regarding his symptoms.

### A. Medical History Overview

1. Medical Treatment

In October 2016, Ronnie established care at Shawsville Family Medicine. R. 342. He complained of right-sided sciatica. Ronnie's physical exam revealed good range of motion, no paraspinal tenderness or swelling, and negative straight leg raise; however, the treating physician noted significant muscle tension in Ronnie's lower back. The ALJ diagnosed him with acute

4

right-sided low back pain and referred Ronnie for physical therapy. Ronnie completed a course of physical therapy in November 2016, attending five appointments. R. 450, 452, 454, 456, 458. Upon examination, the physical therapist found spinal subluxations, pain and tenderness, postural deficiencies, and muscle spasms. Ronnie only reported limited improvement and continued to complain of pain when sitting for long periods of time. See R. 452, 456.

In December 2016, Ronnie attended an appointment at the Dorsett Chiropractic Clinic. R. 461. Chiropractic manipulative therapy provided Ronnie with no benefit, and Ronnie's treating provider, Richard Dorsett, D.C., reported that Ronnie "could not stand on one leg[,] could not heel and toe walk" and had a positive straight leg raise. R. 461. Dr. Dorsett further noted that Ronnie "was using a cane and could not transition or walk without it." Id. Several days later, Ronnie presented at the emergency room complaining of long-term lower back pain radiating down to his right leg. R. 337–39. Objective examination revealed a normal range of motion and tenderness, and an MRI showed moderate loss of disc space from degenerative disc disease and some mild bilateral facet arthrosis. Id. Ronnie's treating physician diagnosed him with chronic midline low back pain with right-sided sciatica, and suggested follow-up with his primary care physician and consultation with an orthopedic surgeon. Id.

In February 2017, Ronnie attended an appointment with Neurosurgery Ion. R. 331 Objective examination revealed antalgic gait, tenderness, and a positive straight leg raise, and an MRI showed mild-to-moderate lumbar spondylosis, but no evidence of acute fractures. R. 331, 358. Ronnie's treating physician recommended steroid injections and medication. R. 331. In March 2017, Ronnie had a steroid injection, which he reported improved his pain. R. 337, 380. Physical examination at this appointment revealed normal gait and balance and full strength in Ronnie's legs, however, he had a positive straight leg raise. R. 380.

5

Ronnie followed-up with Neurosurgery Ion in May 2017. He reported that the steroid injections help, but that his pain returns. R. 378. His physical exam revealed antalgic gait, non-tender lumbar region, negative straight leg raise, and 5/5 strength in his lower extremities. Id. His treating physician suggested that Ronnie consider surgery or a pain management referral. Id. Ronnie reported interest in pain management several days after this appointment. Id.

In July 2017, Ronnie attended a follow-up appointment at Shawsville Family Medicine, complaining of a flareup of his low back pain. His physical exam revealed difficulty transferring to stand and antalgic gait, however, Ronnie also had a non-tender lower back, good toe raise, and near full strength in his lower extremities. R. 470. His treating physician diagnosed him with degenerative disc disease and lumbar stenosis and recommended treatment with medication. Id.

In December 2017, Ronnie attended his first pain management appointment. R. 424. Physical exam revealed a decreased range of motion in his lumbar back, tenderness, pain, spasm, and an abnormal straight leg raise. R. 424. Ronnie had normal strength and normal gait and was treated with medication. Ronnie attended a pain management follow-up appointment in July 2018. He reported similar pain, noting that he was not interested in surgery. His treating physician recommended a spinal cord stimulator trial. R. 433. Ronnie was psychologically cleared for a spinal cord stimulator and in December 2018, Elizabeth Russo-Stringer, M.D., implanted the spinal cord stimulator lead. R. 504, 518. Ronnie stated that lumbar pain was exacerbated by the device and he had the lead removed several days later. R. 511. Ronnie followed-up with pain management in July 2019, complaining again of lower back pain and associated radiation and numbness. R. 575. His physical exam revealed decreased range of motion in his lumbar back, positive straight leg raise, and normal gait. His treating physician

reported he used a cane at his appointment. Id. In August 2019, Ronnie reported back to Dr. Russo-Stringer and she performed a lumbar medial branch block. R. 589.

Ronnie also complained of shoulder pain during the relevant period. See R. 476, 535. In June 2018, Ronnie attended an appointment with orthopedist Christopher John, M.D., for an evaluation of his left shoulder pain. R. 476. Physical exam revealed that Ronnie had normal cervical spine range of motion, no tenderness, no shoulder asymmetry, and generally normal strength. Id. X-rays showed no acute injury, but it did reveal mild degenerative changes. Dr. John found Ronnie had left shoulder impingement and performed a steroid injection. Id.

2. Medical Opinions

In April 2017, state agency physician Bert Spetzler, M.D., reviewed the record and found Ronnie capable of sedentary work. R. 82. Specifically, Dr. Spetzler found Ronnie could stand or walk four hours and sit six hours in an eight-hour day. R. 79. He also found that Ronnie had some postural limitations and environmental limitations, but no manipulative, visual, or communicative limitations. R. 79–80. The ALJ gave Dr. Spetzler's opinion partial weight. R. 21. State agency physician Robert McGuffin, M.D., reconsidered the record in June 2017. R. 91. Dr. McGuffin found similar exertional, postural, and environmental limitations. R. 89–90. The ALJ gave Dr. McGuffin's opinion partial weight. R. 21.

In March 2019, Louis Fuchs, M.D., completed medical interrogatories in response to the ALJ's request. R. 523. Dr. Fuchs found Ronnie capable of continuously lifting and carrying up to ten pounds and occasionally lifting and carrying between eleven and twenty pounds. R. 527. He also found that Ronnie could occasionally reach overhead with his right and left hand, but he could continuously reach and manipulate in all other directions. R. 529. He found that Ronnie could walk, sit, and stand for up to one hour at a time without interruption and that he could sit a

total of eight hours and stand and walk up to two hours in an eight-hour day. R. 528. Dr. Fuchs further concluded that Ronnie did not require the use of a cane to ambulate. Id.

### B. Physical RFC and Function-by-Function Analysis

Ronnie argues that the ALJ's physical RFC findings are not supported by substantial evidence. Pl's Br. at 12–17, Dkt. 15. Ronnie generally argues that the ALJ minimized objective findings throughout the record, and that he misstated the record regarding his cane usage. See Pl.'s Br. at 15, Dkt. 15. Ronnie specifically argues that the ALJ failed to explain "why [Ronnie's] left shoulder impairment only resulted in a limitation to occasionally reach overhead . . . and did not result in a limitation to reaching in any other direction." He similarly argues that the ALJ did not properly explain his determination that Ronnie only needed the opportunity to stand at his workstation up to five minutes per hour. Pl.'s Br. at 14, Dkt. 15. Ronnie's argument amounts to a disagreement with the ALJ's RFC determination and essentially asks the court to reweigh the evidence.

A function-by-function analysis requires the ALJ to develop an adequate RFC which accounts for the work activities the claimant can perform given the physical or mental impairments affecting his ability to work. Importantly, the ALJ must explain the conclusions reached and explain any record evidence which contradicts the RFC determination. See SSR 96-8p; see also Monroe v. Colvin, 826 F.3d 176, 189 (4th Cir. 2016) (emphasizing that an ALJ needs to provide an explicit explanation linking medical evidence listed in the decision to his ultimate findings). The ALJ is instructed to cite specific medical facts and non-medical evidence supporting his conclusion, discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis, describe the maximum amount of each work-related activity the individual can perform, and explain how any material

inconsistencies or ambiguities in the evidence were considered and resolved. SSR 96-8p, 1996 WL 374184, at *7.

In Mascio v. Colvin, the court rejected a "per se rule requiring remand when the ALJ does not perform an explicit function-by-function analysis," agreeing instead with the Second Circuit that "'[r]emand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review.'" Mascio, 780 F.3d at 636 (citing Cichocki v. Astrue, 729 F.3d 172, 177 (2d Cir. 2013)). "The Mascio Court held remand was necessary, in part, because the ALJ failed to indicate the weight given to two residual functional capacity assessments which contained relevant conflicting evidence regarding the claimant's weight lifting abilities." Newcomb v. Colvin, No. 2:14–CV–76, 2015 WL 1954541, at *3 (N.D.W. Va. Apr. 29, 2015).

Here, the ALJ's decision includes the narrative discussion required by SSR 96–8p and contains sufficient information to allow meaningful review. Unlike the ALJ in Mascio, the ALJ in this case did not fail to consider conflicting medical evidence. Further, the court is "not left to guess about how the ALJ arrived at his conclusions" because the ALJ's findings include an analysis of Ronnie's medical records, the medical opinions, Ronnie's hearing testimony, and the ALJ's conclusions. R. 19–22. The ALJ's opinion specifies how the limitations in the RFC correlate with Ronnie's severe impairment.

First, the ALJ did not improperly minimize the objective evidence in this case. Ronnie generally contends that the ALJ minimized findings of antalgic gait, positive straight leg raise, diminished sensation over Ronnie's right leg, and decreased range of motion. Pl.'s Br. at 15, Dkt. 15. The ALJ directly considered these conditions in his decision. See, e.g., R. 20, 22

9

(antalgic gait); R. 20, 22 (straight-leg raising); R. 18, 20–22 (diminished sensation); R. 20 (limited range of motion, tension, and back pain). More specifically, Ronnie argues that the ALJ incorrectly characterized his MRI findings. Pl.'s Br. at 15–16, Dkt. 15. He states that "[t]he ALJ's assertion that [his] MRI findings only show mild nerve root impingement is in error. The lumbar MRI findings showed mild to moderate lumbar spondylosis." Id. The ALJ's statement is a reasonable interpretation of the medical record. While Ronnie correctly notes that the February 2017 MRI revealed "[m]ild to moderate lumbar spondylosis, most prominent at L4-L5," the ALJ's statement that the MRI findings revealed "mild nerve root impingement" appears to describe another section of the MRI findings, which noted that Ronnie had a "mild impression upon the transiting RIGHT L5 nerve root." See R. 331, 351. Moreover, even assuming the ALJ improperly minimized the evidence, I find no material error, "particularly when the ALJ's evaluation of [the record] is viewed in the context of the other substantial evidence [] which supports the ALJ's [RFC]." Hensley v. Saul, No. 3:19-cv-00845, 2020 WL 5351655, at *7 (S.D.W. Va. Aug. 18, 2020); see also Persad v. Colvin, No. 11–cv–03506, 2014 WL 4988473, at *3 (E.D. Pa. Oct. 7, 2014). Here, the decision, viewed as a whole, plainly acknowledges the February 2017 MRI's findings. See R. 20 ("An MRI from February 2017 showed Tarlov cysts and a moderate to marked broad-based disc budge with mild impression on the right L5 nerve root."). Ronnie disputes the ALJ's reasonable interpretation of the objective medical evidence. While Ronnie may disagree with the ALJ's interpretation of the evidence, it is not for this Court to "re-weigh conflicting evidence" or "substitute [its] judgment" for that of the ALJ. Craig, 76 F.3d at 589 (4th Cir. 1996).

Ronnie additionally argues that the RFC is not supported by substantial evidence because the ALJ failed to account for his cane usage. Pl.'s Br. at 16, Dkt. 15. The ALJ did misstate the

record in his comment that "there is no record . . . that he used [a cane] at appointments." R. 22. The record, in fact, shows two occasions where treating providers reported Ronnie's cane use. R.461 ("[Ronnie] was using a cane and could not transition or walk without it."); R. 580 ("Walks with cane for assistance."). This error is harmless as I find that there is substantial evidence to support the ALJ's finding that Ronnie does not require a cane to ambulate.

> Social Security Ruling 96–9p provides:
>
> To find that a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information).

SSR 96–9P, 1996 WL 374185, at *7 (July 2, 1996). Ronnie has not provided any medical documentation indicating that one of his health care providers ordered him to walk with a cane, let alone records establishing the circumstances for which a cane is needed, and he has failed to meet his burden of proving that the cane is medically necessary. Richardson v. Califano, 574 F.2d 802, 804 (4th Cir. 1978) (stating that the burden is on the claimant in steps one through four); Carreon v. Massanari, 51 Fed. App'x 571, 575 (6th Cir. 2002) (finding if a cane is not medically necessary, then "it cannot be considered an exertional limitation that reduce[s] [the claimant's] ability to work."). Dr. Dorsett's statement that "[Ronnie] was using a cane and could not transition or walk without it" fails to meet the standard for medical necessity. Cf. Estridge v. Saul, No. 1:19-1247, 2020 WL 4588473, at *19 (D.S.C. May 18, 2020) (finding medical necessity where "a majority of records from multiple providers reflect the use" of an assistive device, "records from multiple providers reflect[ed] gait abnormalities consistent with use of an ambulatory device," and "[e]vidence of syncopal episodes," among other conditions further supported claimant's dependence). Here, there is limited indication in the record that Ronnie

11

used a cane at his appointments and there is no indication his physicians prescribed a cane. Moreover, while Ronnie often had positive straight leg raise and antalgic gait, he also generally had full strength in his lower extremities throughout the record. See, e.g., 331, 332, 378, 389, 391, 441, 575 (full strength and no weakness in lower extremities); see also R. 345, 353 (no swelling or tenderness in lower extremities). Additionally, Dr. Fuchs, whom the ALJ gave great weight, found that Ronnie does not require a cane to ambulate. R. 528, 532. The state agency physicians similarly concluded that there is no objective evidence of Ronnie's assistive device usage. R. 42, 64–65, 77, 91; see Moss v. Colvin, No. 5:16–CV–47, 2017 WL 3025818, at *17 n.14 (N.D.W. Va. May 26, 2017).

Ronnie next argues that the ALJ's RFC restriction that "[Ronnie] must be allowed the opportunity to stand at the workstation up to 5 minutes per hour" is not supported by substantial evidence as he failed to explain how he arrived at this finding. The ALJ adequately supported this finding, noting throughout the opinion that Ronnie had generally mild to moderate abnormalities. See R. 20–22. He acknowledged Ronnie's hearing testimony and noted that while Ronnie had findings of antalgic gait and positive straight-leg raising, that he had generally full leg strength and normal muscle tone.[5] See, e.g., 331, 332, 378, 389, 391, 441, 575 (full strength and no weakness in lower extremities); see also R. 345, 353 (no swelling or tenderness in lower extremities); R. 329, 338, 387, 428 (normal muscle tone). He further noted that while Ronnie occasionally reported decreased sensation in his legs, such complaints were only occasional. R. ; R. 428, 437 (decreased sensation in right S1 dermatome below knee); R. 332, 380, 391 (sensation intact). The ALJ also relied on Ronnie's treatment history, noting that Ronnie

---

[5] While Ronnie's treating physicians often found antalgic gait and positive straight leg raise, these findings were not consistent throughout the treatment record. R. 341, 378 (negative straight leg raise); R. 345, 353, 380, 428, 437, 580 (normal gait).

12

attended infrequent appointments with his pain management provider and that he consistently stated he did not want surgery. R. 22. See Boswell v. Berryhill, Case No.: 1:17-cv-03411, 2018 WL 3321472, at *13 (S.D.W. Va. May 18, 2018) (considering claimant's sporadic treatment and refusal for definitive diagnostic testing); Va Vue Vang v. Saul, No. 1:18CV255, 2019 WL 4220934, at * 11 n.11 (M.D.N.C. Sept. 5, 2019) (finding ALJ's consideration that Plaintiff refused to undergo surgery as evidence that symptoms did not reach level of severity Plaintiff alleged). The ALJ concluded that this indicated "[Ronnie's] back pain is not yet at a point where it would preclude even sedentary work consistent with the [RFC]." R. 22; see also R. 434 (suggesting Ronnie's pain was "tolerable"). The RFC is also consistent with Dr. Fuch's opinion, who found that Ronnie could sit up to one hour at a time without interruption. R. 528.

Finally, Ronnie argues that the ALJ failed to account for his left shoulder impairment, arguing that any limitation should have restricted his ability to reach in all directions, not just overhead. Pl.'s Br. at 14, Dkt. 15. The ALJ adequately reviewed the record, describing Ronnie's testimony and Ronnie's treatment with Dr. John. R. 20–21, 480. In support, the ALJ noted that Ronnie's shoulder examination revealed only "mildly limited strength in elevation and external rotation." Id. The ALJ further relied on Dr. Fuchs's opinion, who found that Ronnie could reach overhead only occasionally, but in all other directions continuously. R. 21.

Accordingly, I find that substantial evidence supports the ALJ's RFC determination.

### C. Subjective Allegations

Ronnie asserts that the ALJ erred by "improperly discount[ing] [his] subjective complaints of pain and fatigue based largely on the lack of objective medical evidence substantiating his statements." Pl.'s Br. at 18, Dkt. 15. Ronnie also restates his argument that the ALJ failed to explain how Ronnie's refusal to undergo surgery supports the RFC. Id. at 17.

When evaluating a claimant's symptoms, ALJs must use the two-step framework set forth in 20 C.F.R. § 404.1529 and SSR 16-3p, 2016 WL 1119029 (Mar. 16, 2016). First, the ALJ must determine whether objective medical evidence presents a "medically determinable impairment" that could reasonably be expected to produce the claimant's alleged symptoms. 20 C.F.R. § 404.1529(b); SSR 16-3p, 2016 WL 1119029, at *3. Second, after finding a medically determinable impairment, the ALJ must assess the intensity and persistence of the alleged symptoms to determine how they affect the claimant's ability to work and whether the claimant is disabled. See 20 C.F.R. § 404.1529(c); SSR 16-3p, 2016 WL 1119029, at *4. "At this step, objective evidence is *not* required to find the claimant disabled." Arakas v. Comm'r, 983 F.3d 83, 98 (4th Cir. 2020) (citing SSR 16-3p, 2016 WL 1119029, at *4–5). SSR 16-3p recognizes that "[s]ymptoms cannot always be measured objectively through clinical or laboratory diagnostic techniques." Id. at *4. Thus, the ALJ must consider the entire case record and may "not disregard an individual's statements about the intensity, persistence, and limiting effects of symptoms solely because the objective medical evidence does not substantiate" them. Id. at *5.

Ronnie directly compares this case to Arakas, arguing that like that ALJ, the ALJ here "'applied an incorrect legal standard' in discrediting [claimant's] complaints based on the lack of objective evidence corroborating them," and consequently improperly increased the burden of proof. Arakas, 983 F.3d at 95. Ronnie's effort to apply Arakas to this case is unavailing. In Arakas, the plaintiff experienced pain from a condition that did not create objective findings, and the Fourth Circuit found that the ALJ erred by relying on the absence of such findings to discount the plaintiff's subjective statements. Here, the ALJ did not rely on the absence of

14

objective medical evidence.[6] R. 22 (ALJ "acknowledg[ing] that pain and symptoms are not always accompanied by objective evidence and [that he] will not disregard [Ronnie's] statements regarding symptoms solely due to a lack of objective evidence."). Instead, the ALJ recognized that Ronnie's subjective statements about the intensity of his symptoms and their effect on his ability to work were inconsistent with the medical evidence, which included evidence that Ronnie only attended limited treatment with his pain management provider and he regularly indicated no interest in taking certain medications or undergoing surgery. See Walker v. Saul, No. 2:20-cv-00196, 2021 WL 342570, at *10 (S.D.W. Va. Jan. 6, 2021) ("[T]he ALJ did not discount [c]laimant's subjective complaints based on the lack of objective evidence, but instead properly considered numerous factors, including [c]laimant's daily activities). Cf. Arakas, 983 F.3d at 97 ("Thus, while the ALJ may have considered other evidence, his opinion indicates that the lack of objective medical evidence was his chief, if not definitive, reason for discounting Arakas's complaints.").

The ALJ noted that Ronnie's treatment, especially for pain management, was somewhat irregular, noting that "[s]ince 2017, [Ronnie] went to pain management for his back pain only about twice a year." R. 22; see R. 434, 470, 575 (suggesting pain is tolerable); 575 (noting Ronnie canceled pain management appointment). He also considered that while Ronnie did have several injections and underwent a spinal cord stimulator trial, his treatment was generally limited to medication and he has repeatedly rejected or indicated no interest in surgical treatment. R. 391, 434, 437, 514, 535, 575, 593. Moreover, the ALJ considered and analyzed the objective evidence, namely, Ronnie's physical examination results, x-rays, and MRI results

---

[6] Unlike Arakas, the medical record here included extensive objective findings, which the ALJ documented in his review of the medical evidence and in his analysis.

throughout the relevant period, determining that the diagnostic testing revealed generally mild or moderate abnormalities.

Though Ronnie disagrees with the ALJ's analysis and conclusions, he does not identify any material conflicting evidence that the ALJ failed to consider or any material misstatement of the evidence of record. Rather, Ronnie simply asks the Court to reweigh the evidence and reach a different conclusion than the ALJ. It is for the ALJ to determine the facts of a particular case and to resolve inconsistencies between a claimant's alleged impairments and his ability to work. See Smith v. Chater, 99 F.3d 635, 638 (4th Cir. 1996); see also Shively v. Heckler, 739 F.2d 987, 989-90 (4th Cir. 1984) (finding that because the ALJ had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight). The ALJ's opinion was applied the proper legal standard, and I will not re-weigh the evidence. Accordingly, I conclude that the ALJ supported his analysis of Ronnie's subjective complaints with substantial evidence, and that Ronnie can perform work at the level stated in the ALJ's opinion.

## CONCLUSION

For the foregoing reasons, I **RECOMMEND** entering an order **AFFIRMING** the final decision of the Commissioner, **GRANTING** summary judgment to the defendant, **DENYING** the plaintiff's motion for summary judgment, and **DISMISSING** this case from the court's docket.

The Clerk is directed to transmit the record in this case Elizabeth K. Dillon, United States District Judge, and to provide copies of this Report and Recommendation to counsel of record. Both sides are reminded that pursuant to Rule 72(b), they are entitled to note any objections to this Report and Recommendation within fourteen (14) days hereof. Any adjudication of fact or

conclusion of law rendered herein by me that is not specifically objected to within the period prescribed by law may become conclusive upon the parties. Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1) as to factual recitations or findings as well as to the conclusion reached by me may be construed by any reviewing court as a waiver of such objections, including the waiver of the right to appeal.

Entered: January 12, 2022

*Robert S. Ballou*

Robert S. Ballou
United States Magistrate Judge